IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEITH EDWIN DAVIS**, | ) | |
| | ) | |
| Plaintiff, | ) | 2:13cv434 |
| | ) | **Electronic Filing** |
| v. | ) | |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

## I. INTRODUCION

Plaintiff, Keith Edwin Davis ("Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) of the Social Security Act (the "Act"), seeking judicial review of the final decision of the

Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for

Disability Insurance Benefits ("DIB") and supplemental security income ("SSI") under Titles II

and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq*. and § 1381 *et seq*. ("Act").  The

record has been developed at the administrative level.  The matter is before the Court on cross-

motions for summary judgment.  (ECF Nos. 11, 14).  For the reasons that follow, Plaintiff's

Motion for Summary Judgment will be granted and Defendant's Motion for Summary Judgment

will be denied.  The Commissioner's decision will be vacated, and the case will be remanded for

further proceedings consistent with this Memorandum Opinion.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI benefits on January 18, 2011, alleging that he had been

disabled since January 1, 2007 due to asthma, chronic obstructive pulmonary disease ("COPD"),

and back and neck pain. (R. at 143-155, 168).[1] The applications were denied, and Plaintiff filed a written request for an administrative hearing. (R. at 78-87, 94). On September 4, 2012, a hearing was held before Administrative Law Judge ("ALJ") Leslie Perry-Dowdell. (R. at 29-51). Plaintiff, who was represented by counsel, appeared and testified. (R. at 33-47). Additionally, an impartial vocational expert, David Zak, testified at the hearing. (R. at 46-51).

In a decision dated November 16, 2012, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. (R. at 14-24). The Appeals Council denied Plaintiff's request for review on January 25, 2013 (R. at 1-7), thereby rendering the ALJ's decision the final decision of the Commissioner in this case. The instant action followed.

## III. STATEMENT OF THE CASE

### A. General background

Plaintiff was born on August 23, 1958, making him 50 years old on his alleged onset date, and 54 years old at the time of the hearing. (R. at 23). Plaintiff completed school through the tenth grade, and had prior work experience as a laborer. (R. at 169).

### B. Medical evidence submitted to the ALJ

On April 28, 2010, Plaintiff was seen by Arif Rafi, M.D., for complaints of back, right arm and neck pain after falling off a truck at work.[2] (R. at 232). Some tenderness of the lumbar paraspinal muscles was found on physical examination, but Plaintiff's remaining examination was unremarkable. (R. at 233). He was assessed with a backache, unspecified, and degenerative joint disease (lumbar), and prescribed physical therapy and medication. (R. at 233). On June 23, 2010, Plaintiff reported that his fall had actually occurred fifteen years prior. (R. at 230). He

---

[1] References to the administrative record (ECF No. 7), will be designated by the citation "(R. at __)".
[2] Plaintiff does not challenge the ALJ's decision with respect to his mental impairments. Accordingly, the Court confines its discussion to the medical evidence relating to his alleged physical impairments.

continued to complain of intermittent sharp pain. (R. at 230). He was assessed with lumbar and cervical degenerative disc disease with radiculopathy, and right shoulder arthralgia. (R. at 231).

On January 12, 2011, Dr. Rafi noted that Plaintiff "[s]till [had] pain" and was waiting for insurance before undergoing an MRI. (R. at 227). On February 10, 2011, Plaintiff reported to Dr. Rafi that he felt sore in his low back and neck after shoveling snow. (R. at 225). On March 9, 2011, Plaintiff was seen by Dzenita Turcinhodzic, PA-C, and continued to complaint of low back soreness. (R. at 275). A CT scan of Plaintiff's lumbar spine dated March 25, 2011 showed multilevel degenerative changes. (R. at 235-236).

On April 29, 2011, Plaintiff underwent a consultative physical examination performed by Henry Holets, Jr., M.D. (R. at 239-243). Plaintiff reported smoking a pack of cigarettes a day for thirty years. (R. at 239). Plaintiff claimed an inability to work due to asthma, COPD, arthritis, and back and neck pain. (R. at 239). Plaintiff stated that he had been "bothered" by asthma for ten years, but admitted that he had not been treated for this condition or undergone any pulmonary function testing. (R. at 239). Plaintiff's lungs were clear, and his remaining physical examination was essentially unremarkable. (R. at 241). Dr. Holets diagnosed Plaintiff with obesity, tobacco usage, history of low back complaints, and history of drug detox. (R. at 242). He opined that Plaintiff could lift twenty to twenty-five pounds, had no limitations in his ability to stand, walk or sit, could engage in occasional postural activities, and had no environmental restrictions. (R. at 242).

When seen by Dr. Rafi on May 4, 2011, Plaintiff complained of soreness for the past three days after working on his truck. (R. at 271). On physical examination, tenderness and spasms in the lumbar spine were noted, but his remaining physical examination was

unremarkable. (R. at 272). He was assessed with low back pain and continued on medication. (R. at 272).

On May 10, 2011, Dilip Kar, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform light work.[3] (R. at 57-60). Dr. Kar found that Plaintiff could lift or carry twenty pounds occasionally; lift or carry ten pounds frequently; stand, walk or sit about six hours in an eight-hour workday; and could occasionally perform postural activities. (R. at 58-59). He further found that Plaintiff needed to avoid exposure to extreme weather conditions, and avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation due to his tobacco usage. (R. at 59). Dr. Kar found that Plaintiff's statements were only partially credible since his daily activities were not significantly limited in relation to his alleged symptoms. (R. at 59). Dr. Kar observed that Plaintiff had not sought treatment for his impairment recently, and had not been prescribed narcotic pain medication. (R. at 59). Finally, Dr. Kar noted that his assessment was consistent with Dr. Holet's assessment. (R. at 59).

Plaintiff returned to Ms. Turcinhodzic on May 31, 2011, and it was noted that Plaintiff continued to complain of pain despite medication. (R. at 270). When seen on June 28, 2011, physical examination revealed tenderness and muscle spasms of the lumbar spine, decreased ranges of motions were found throughout, his sensation and motor examination were abnormal, and his patellar reflex was diminished bilaterally. (R. at 268). Plaintiff was assessed with chronic pain syndrome and epidural injection therapy was discussed. (R. at 268).

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Plaintiff subsequently had a lumbar epidural steroid injection on August 15, 2011. (R. at 263-264). When seen by Ms. Turcinhodzic on August 24, 2011, he reported having good pain relief from the injection therapy. (R. at 262). Plaintiff had additional epidural injections administered on September 19, 2011 and October 17, 2011. (R. at 256-257, 259-260). On October 19, 2011, Plaintiff complained of pain in his low back, left ankle and foot. (R. at 254). On physical examination, tenderness and spasms were found in the lumbar spine, he had decreased range of motion throughout, his sensation and motor examination was abnormal, and his patellar reflex was diminished bilaterally. (R. at 255). Ms. Turcinhodzic noted that Plaintiff's pain was stable but that he might need physical therapy. (R. at 255).

On November 16, 2011, Plaintiff stated that his pain was worse when working, but that he had slowed down at work. (R. at 252). His physical examination remained the same. (R. at 252). Ms. Turcinhodzic reported that Plaintiff's low back pain was stable, and she continued his medications. (R. at 252). On December 14, 2011, Plaintiff reported that he was currently working as a mechanic and was experiencing increased low back pain. (R. at 248-249). It was noted that Plaintiff had good pain relief with epidural injections, but it was non-lasting. (R. at 249). His physical examination remained unchanged. (R. at 249).

When seen by Ms. Turcinhodzic on January 11, 2012, his physical examination remained the same. (R. at 245-246). On February 8, 2012, Plaintiff complained of low back, leg, left ankle and foot pain. (R. at 296). He reported suffering from a cold, and complained of trouble breathing, shortness of breath, wheezing and respiratory infections. (R. at 296-297). On physical examination, his expansion was normal but his breath sounds were abnormal. (R. at 297). Tenderness of the lumbar spine was found, and he had a decreased range of motion with lumber flexion, extension and lateral rotation. (R. at 297). His gait was asymmetric and

abnormal. (R. at 297). He was assessed with low back pain, and instructed to seek emergency room treatment if his cold symptoms worsened. (R. at 297).

Plaintiff presented to the emergency room on February 11, 2012 complaining of a progressive cough, fever, and shortness of breath for three to four days, and he was admitted for acute respiratory failure, hypoxic. (R. at 352). He was started on oxygen, nebulizers, and steroids. (R. at 352). His pulmonary function test showed severe obstructive airway disease with air trapping, FEV1 of about 1.0 liters, 29 percent predicted, but no evidence of restrictive lung disease. (R. at 352, 379). Cardiac catherization revealed normal coronaries, normal left ventricular systolic function, ejection fraction 55 to 60 percent, no significant mitral regurgitation, and no significant aortic stenosis. (R. at 352-353, 384-385). An echocardiogram showed a limited study, but Plaintiff's left ventricle appeared to be normal. (R. at 353, 386-387). Chest x-rays showed no acute cardiopulmonary disease or emphysematous lung. (R. at 353, 383). A CT angiogram of the chest revealed minimal bibasilar atelectasis and chronic lung disease, but no evidence of pulmonary embolism or aortic dissection. (R. at 353, 381). During his hospital stay, Plaintiff was seen by Surinder K. Aneja, M.D., a pulmonologist, and reported that his symptoms of shortness of breath had gotten progressively worse, and that during the last year, his activities at home were markedly limited. (R. at 362). He complained of shortness of breath on mild exertion, with intermittent wheezing and chest tightness. (R. at 362).

Plaintiff was discharged on February 16, 2012 with a diagnosis of COPD, hypoxia, non-ST elevation myocardial infarction, pulmonary hypertension, obesity, history of intravenous drug abuse on methadone, possible obstructive sleep apnea, and tobacco abuse disorder. (R. at 352). His methadone and oxycodone were continued through the methadone clinic, and he was prescribed Spiriva, Medrol Dosepak, Symbicort, and metoprolol. (R. at 353). Plaintiff was

hemodynamically stable and felt fine on discharge. (R. at 353). He was discharged on oxygen administered through a nasal cannula at four liters per minute. (R. at 353). He was to follow up Dr. Aneja in one to two weeks, and with his primary care physician as soon as possible. (R. at 353). His prognosis was fair to poor, considering his multiple comorbidities. (R. at 353).

Plaintiff returned to Ms. Turcinhodzic on March 7, 2012, and physical examination revealed abnormal expansion and abnormal wheezing. (R. at 294). Ms. Turcinhodzic reported that Plaintiff had previously been hospitalized due to his COPD and was placed on oxygen. (R. at 294). Plaintiff's lumbar spine examination and gait remained unchanged. (R. at 294). When seen on April 4, 2012, Plaintiff had abnormal wheezing, rales and rhonchi were present in his lungs, and his expansion was abnormal. (R. at 290). Plaintiff reported that he stopped smoking in March 2012. (R. at 289). His lumbar examination revealed normal range of motion, however, there was decreased range of motion on extension and lateral rotation. (R. at 290). Plaintiff's gait continued to be asymmetrical and abnormal. (R. at 290). He was continued on medications. (R. at 290). On May 2, 2012, Plaintiff complained of low back pain and bilateral leg pain. (R. at 285). Plaintiff continued to complain of trouble breathing, wheezing and respiratory infections. (R. at 286). His lung examination revealed abnormal expansion and wheezing, and rales and rhonchi were present. (R. at 286). His lumbar examination remained unchanged. (R. at 286). Plaintiff was continued on his medications. (R. at 286). On May 30, 2012, his lung and lumbar examination remained the same. (R. at 282).

Plaintiff was admitted to the hospital on May 30, 2012 for swelling in his left wrist after injecting heroin several days prior to admission. (R. at 301, 303-304). A chest x-ray showed changes consistent with COPD, but no acute cardiopulmonary process was seen. (R. at 337). On May 31, 2012, he underwent surgical removal of the abscess and treatment for cellulitis of his

left wrist. (R. at 303-304). During a consultation on June 2, 2012, Plaintiff had generalized decreased breath sounds, but no rubs, rales or rhonchi on physical examination. (R. at 314). A chest x-ray taken for venous line placement revealed that Plaintiff's heart and lungs were normal. (R. at 338). On June 3, 2014, Plaintiff's lungs were clear with an increased expiratory phase and a few rhonchi. (R. at 317). During a consultation on June 4, 2012, Plaintiff reported shortness of breath but his chest was clear to auscultation. (R. at 310). It was noted that Plaintiff was having increased shortness of breath requiring four liters of nasal cannula oxygen to obtain 95 percent oxygen saturation. (R. at 311). A chest x-ray revealed no evidence of a pulmonary embolism or an aortic dissection or rupture. (R. at 339). His June 5, 2012 echocardiogram showed borderline pulmonary hypertension. (R. at 345). Plaintiff was subsequently discharged on June 13, 2012 in good condition. (R. at 304).

### C. Medical evidence submitted to the Appeals Council

On September 18, 2012, Plaintiff submitted a letter from Carolyn Gardner, R.N., which stated that Plaintiff was an active hospice patient with Amedisys/Albert Gallatin Hospice. (R. at 397). Ms. Gardner reported that Plaintiff had elected hospice on September 13, 2012 and qualified with a terminal diagnosis of COPD. (R. at 397).

Similarly, on December 3, 2012, John Robinson, R.N., stated that he was a case manager in charge of Plaintiff's care for the past two months. (R. at 398). Mr. Robinson indicated that Plaintiff had severe, advanced COPD exhibiting severe activity intolerance. (R. at 398). He noted that walking more than about ten feet produced shortness of breath, and even simple tasks such as making the bed, talking, laundry and activities of daily living caused extreme respiratory discomfort. (R. at 398). He further noted that Plaintiff's oxygen saturation percentage on four liters of oxygen was historically 90-92, but when active it dropped to 80-84. (R. at 398). Mr.

Robinson stated that Plaintiff had two episodes of extreme exacerbation of his COPD requiring antibiotic and steroid therapy. (R. at 398). Mr. Robinson opined that Plaintiff, with his advanced COPD, was "too fragile" and not a candidate for employment. (R. at 398).

### D. Hearing testimony

At the hearing, Plaintiff amended his disability onset date to August 1, 2009. (R. at 33). Plaintiff last worked in July 2009, but collected unemployment compensation until July 2012. (R. at 33-34). He indicated that he completed seven applications while on unemployment compensation and was interviewed on four occasions. (R. at 44-45). Plaintiff testified that he had been on oxygen since February 2012 and had used an inhaler prior to that date. (R. at 34). Plaintiff claimed that he had been "clean" since March 2005 or March 2006, and that the hospital records incorrectly stated that his abscess was due to recent heroin usage. (R. at 35). Plaintiff stated that he had been on methadone for the past two years, and attended NA meetings twice a week. (R. at 36). Plaintiff claimed he stopped smoking six months prior to the hearing. (R. at 37). Plaintiff claimed it took him one and on-half hours dress due to trouble breathing, and he was unable to perform any household chores. (R. at 37).

Plaintiff also suffered from back and leg pain, and epidural injections temporarily helped alleviate his back pain. (R. at 39). His medications consisted of Motrin, Oxycodone, and Flexeril. (R. at 39-40). Plaintiff stated that he spent most of his days alternating between sitting in a recliner and walking in order to alleviate his pain. (R. at 41-42). He claimed he could sit for 30 minutes, stand for 10 to 20 minutes, walk 10 feet, and lift a gallon of milk. (R. at 41-43).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work, who needed to avoid excessive exposure to environmental irritants such as fumes, odors, dusts and gases. (R. at 47). The

vocational expert testified to a significant number of jobs in the national economy that such

hypothetical individual could perform, such as a security guard, storage rental clerk, and office

helper. (R. at 47-48). The vocational expert further testified that positions where an individual

needed to use oxygen continuously were available, such as a cashier II and a security guard. (R.

at 48). Finally, the vocational expert testified that the storage rental clerk job and security job

could be performed with a sit/stand option, and an individual's ability to perform work would not

be affected if the individual needed to take less than ten minute breaks every hour. (R. at 49-50).

## IV.  STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Comm'r

of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is

limited to determining whether the Commissioner's decision is "supported by substantial

evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court

may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of

record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986).

Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §

405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)

(internal quotation marks omitted). As long as the Commissioner's decision is supported by

substantial evidence, it cannot be set aside even if this Court "would have decided the factual

inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the

substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec. of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d) (2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec. of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will
> not review the claim further. At the first step, the agency will find non-disability

11

unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v.*

*Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four

corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D.Pa. 2005).

## V. DISCUSSION

In his decision, the ALJ found that Plaintiff met the insured status[4] requirements of the

Act through June 30, 2011 and had not engaged in substantial gainful activity since August 1,

2009, his alleged onset date. (R. at 16). The ALJ found that although Plaintiff would be denied

for the year 2009 at step one of the sequential evaluation process, he would also be denied

benefits at step five. (R. at 16). The ALJ determined that Plaintiff had the following severe

impairments: obesity, asthma, COPD, and back pain, but determined at step three that he did not

meet a listing. (R. at 17-18). The ALJ found that he was able to perform work at the light level,

however, he needed to avoid excessive exposure to environmental irritants, fumes, dust and

gasses. (R. at 18). At the final step, consistent with the testimony of the vocational expert, the

ALJ found that Plaintiff could perform a significant number of jobs in existence in the national

economy, and thus was not disabled within the meaning of the Act. (R. at 23-24).

Plaintiff's sole argument is that the ALJ erred in failing to evaluate all of the medical

evidence with respect to his COPD. (ECF No. 13 at p. 4). This Court is constrained to agree. In

evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer v.*

*Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). While an ALJ need not comment or reference every

treatment note, his or her decision must demonstrate that all of the medical evidence has been

weighed and evaluated in reaching the disposition. *Fargnoli*, 247 F.3d at 42. Where competent

---

[4] In order to be entitled to DIB under Title II, a claimant must establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). Therefore, for purposes of Plaintiff's DIB claim, Plaintiff must demonstrate he became disabled on or before June 30, 2011. In contrast, SSI does not have an insured status requirement. Therefore, for purposes of Plaintiff's SSI claim, Plaintiff must show that he became disabled prior to the final decision of the Commissioner.

evidence supports a plaintiff's claims, the ALJ must adequately explain in the record his reasons for rejecting or the discrediting competent evidence. *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Without this type of explanation, "the reviewing court cannot tell if significant evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 70507; *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

Here, the ALJ found that "little in the documentary evidence suggests that the severity, frequency, and duration of physical discomfort are as persistent, intrusive, or progressive as the claimant has alleged." (R. at 21). The ALJ observed that while Plaintiff had been diagnosed with, *inter alia*, COPD, his symptoms and functional limitations were not supported by his actual physical condition. (R. at 21). The ALJ further found that his treatment had been conservative in nature and that he had not been hospitalized or sought emergency room treatment for this condition. (R. at 21). Contrary to this finding and absent from the ALJ's discussion however, are the hospitalization records from February 2012 wherein Plaintiff did, in fact, seek emergency room treatment and was subsequently hospitalized for his COPD.

As previously stated, this evidence revealed that Plaintiff sought emergency room treatment for a progressive cough, fever, and shortness of breath for three to four days, and was subsequently admitted for acute respiratory failure, hypoxic. (R. at 352). Pulmonary function testing showed severe obstructive airway disease with air trapping, FEV1 of about 1.0 liters, 29 percent predicted, but no evidence of restrictive lung disease. (R. at 352, 379). Cardiac catherization revealed normal coronaries, normal left ventricular systolic function, ejection fraction 55 to 60 percent, no significant mitral regurgitation, and no significant aortic stenosis. (R. at 352-353, 384-385). Plaintiff reported to Dr. Aneja that his symptoms had gotten progressively worse during the last year, markedly limiting his activities. (R. at 362). He

14

complained of shortness of breath on mild exertion, with intermittent wheezing and chest

tightness. (R. at 362). Plaintiff was discharged with oxygen administered through a nasal

cannula. (R. at 353). Dr. Aneja found that Plaintiff's prognosis was fair to poor considering his

multiple comorbidities. (R. at 353).

The Commissioner argues that the ALJ "made reference" to the fact that she examined

the February 2012 medical records during the administrative hearing, since she confirmed the

Plaintiff's use of oxygen. (ECF No. 15 at p. 11). Simply referring to the records during the

administrative hearing is not, in the Court's view, the same as discussing the findings contained

therein, particularly in light of the fact that Plaintiff's claimed disability is based, in part, on his

COPD. The ALJ did not refer to or discuss these records in her decision, nor did she explain

why she found them not probative with respect to severity of Plaintiff's claimed symptoms.

Additionally, the Court notes that Dr. Rafi's treatment notes arguably lend support to

Plaintiff's contention that his symptoms of COPD progressively worsened,[5] and therefore the

ALJ's omission of any discussion of the hospitalization records is particularly glaring. For

example, one month prior to his hospitalization, Plaintiff reported trouble breathing, shortness of

breath, wheezing, and respiratory infections, and Ms. Turcinhodzic found abnormal breath

sounds. (R. at 297). Following his hospitalization, on March 7, 2012, Plaintiff had abnormal

expansion and abnormal wheezing. (R. at 294). When seen on April 4, 2012, Plaintiff had

abnormal wheezing, rales and rhonchi were present, and his expansion was abnormal. (R. at

290). On May 2, 2012, Plaintiff continued to complain of trouble breathing, and his lung

---

[5] Parenthetically, the Court is troubled by the ALJ's characterization of the Plaintiff's treatment with Dr. Rafi as
being somehow sporadic in nature. (R. at 20) ("Subsequent treatment records in 2011 and 2012 from Dr. Arif Rafi,
show that the claimant was seen sporadically."). Dr. Rafi's treatment notes reveal that Plaintiff was in fact seen by
Dr. Rafi and/or Ms. Turcinhodzic on a regular monthly basis from January 1, 2011 through May 30, 2012 for his
complaints of back pain, and at later visits, for complaints related to his COPD. (R. at 225, 227, 245-246, 248, 252,
254, 262, 265, 268, 270-271, 275, 282, 285, 290, 294, 296).

examination revealed abnormal expansion and wheezing, and rales and rhonchi were present. (R. at 286). Finally, while hospitalized in May 2012, Plaintiff's chest x-ray showed changes consistent with COPD. (R. at 337).

The Court expresses no opinion as to whether Plaintiff was in fact disabled. Rather, the issue is simply whether the ALJ erred in failing to address material evidence supportive of Plaintiff's claim in violation of *Cotter* and its progeny. The Court finds on this record that the ALJ erred in this regard. Consequently, this matter must be remanded to the ALJ with the direction to address the hospitalization evidence consistent with the dictates of the previously described case law.

In a related argument, Plaintiff contends that ALJ failed to address the reports of Ms. Gardner and Mr. Robinson. (ECF No. 13 at p. 4). These reports, however, were submitted after the ALJ rendered her decision in this regard and therefore the issue is whether a new evidence remand is justified in accordance with *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Ms. Gardner's report was generated a few weeks after the ALJ's decision, and Mr. Robinson's report a few months after the decision. The Court need not determine whether this evidence warrants a remand since a remand is necessary on an independent ground. On remand however, Plaintiff can seek to develop the record with all probative evidence bearing on the period of disability under consideration.

## VI. Conclusion

In light of the ALJ's failure to address properly all of the relevant evidence of record and indicate clearly that the proper legal principles were employed, the Court cannot conclude that the ALJ's decision was supported by substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment will be granted to the extent it seeks a remand; Defendant's Motion for

Summary Judgment will be denied; the decision of the ALJ will be vacated; and the case remanded for further proceedings consistent with this Memorandum Opinion. "On remand, the ALJ shall fully develop the record [for the entire period of disability under consideration] and explain [his or her] findings ... to ensure that the parties have an opportunity to be heard on the remanded issues and prevent post hoc rationalization." *Thomas v. Comm'r of the Soc. Sec.*, 625 F.3d 798, 800-01 (3d Cir. 2010); *accord Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). Appropriate Orders will follow.

Date: September 15, 2014

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Mark S. Galper, Esquire
        Christy Wiegand, Esquire

        (*Via CM/ECF Electronic Mail*)